FERNANDO NUNEZ,               :
                                    :
      **Plaintiff**           :
                                      :     **CIVIL NO. 3:CV-14-0727**
   **v.**                           :
                                      :     **(Judge Caputo)**
CO WERTZ, *et al.*,          :
                                      :
      **Defendants**      :

# M E M O R A N D U M

## I.   Introduction

Plaintiff, Fernando Nuñez, a state prisoner proceeding *pro se*, has sued under 42 U.S.C. § 1983 for the alleged hindrance of his ability to access the courts, various incidents of retaliation, the failure of staff to protect him from harm and, his exposure to unsanitary and frigid conditions while dining. He also alleged interference with his ability to practice his religion in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA). Presently before the Court is the Defendants' motion to dismiss the Amended Complaint.

For the reasons that follow, the motion will be denied in part and granted in part.

## II.   Background[1]

Mr. Nuñez filed his Complaint on April 8, 2014. (ECF No. 1, Compl.) Defendants then filed a p artial motion to dismiss. After Mr. Nuñez sought leave to file an amended complaint,

---

[1] The events central to this action occurred while Mr. Nuñez was housed at the Smithfield State Correctional Institution (SCI-Smithfield), in Smithfield, Pennsylvania. Mr. Nuñez is presently housed at SCI-Somerset, in Somerset, Pennsylvania. (ECF No. 74.)

Defendants' motion was dismissed without prejudice and Plaintiff was granted leave to file an amended complaint. (ECF Nos. 33 and 34.) On May 9, 2016, Mr. Nuñez filed a thirty-three page Amended Complaint with over one hundred pages in support. (ECF Nos. 40 and 41.) All Defendants are employed by the Pennsylvania Department of Corrections (DOC). All but one of the Defendant, Deputy Secretary Klopotoski, worked at SCI-Smithfield at all times relevant to this action. The remaining DOC Defendants are: Superintendent John D. Fisher; Corrections Officer (CO) Wertz; CO Hazlett; CO J.R. Householder; CO B. Goughnour; Sgt. Britton and Lt. Eichenlaub.[2] The Defendants filed a motion to dismiss the Amended Complaint on July 15, 2016. (ECF No. 47.) Mr. Nuñez filed his opposition materials on December 6, 2016. (ECF No. 69.) Defendants did not file a Reply brief in support of their motion to dismiss.

## A. RLUIPA CLAIM

Mr. Nuñez converted to Islam in 2003. (ECF No. 40, Am. Compl., ¶13.) The DOC enforces a statewide policy prohibiting inmates from altering the length of state issued trousers. Altered state issued clothing is considered contraband and may subject the inmate to disciplinary action. Muslim inmates at SCI-Smithfield are only permitted to "cuff" or "roll up" their pant legs during communal Jum'ah services. (*Id.*, ¶ 15.) It is Mr. Nunez's sincerely held belief that wearing his pants 2" – 3" above his ankle bone is a religious tenet of his Islamic

---

[2] It appears Mr. Nuñez misspelled several of the Defendants' names in his original complaint. The spelling used by the Court reflects Plaintiff's identification of the Defendants in the Amended Complaint.

faith.  (*Id.*, ¶ 17.)  On November 15, 2009, Mr. Nuñez submitted an inmate religious accommodation request form (RAR) to SCI-Smithfield's Facility Chaplain Program Director (FCPD) requesting to cuff his pants above his ankle at all times, not just during religious services.  (*Id.*, ¶ 16; *see also* ECF No. 41, p.3.)  After he was interviewed by the FCPD, his request was forwarded to the Religious Accommodation Review Committee (RARC).  The RARC recommended to Regional Deputy Klopotoski that Mr. Nuñez's RAR be denied "in light of Department policy and a security concern that prison garb (when altered) can be used for gang identification."  (ECF No. 40, ¶ 19.)  On February 11, 2010, Regional Deputy Klopotoski adopted the RARC's recommendation and denied Plaintiff's RAR request.  (*Id.*, ¶ 20; *see also* ECF No. 41, p. 5.)  Mr. Nuñez filed Grievance 312548-10 concerning the denial of his RAR. His grievance was denied by the Secretary's Office of Inmate Grievance Appeals (SOIGA) on June 1, 2010.  (ECF No. 41, pp. 7 - 10.)  "Soon thereafter," Plaintiff received a disciplinary misconduct for refusing to obey a direct order to roll down his pant legs.  (ECF No. 40, ¶ 23.)

### B.     November 6, 2011 - Restrict Housing Unit

On November 4, 2011, at approximately 8:15 a.m., Mr. Nuñez was charged with fighting with another inmate.  He was removed from SCI-Smithfield's general population and placed in the Restricted Housing Unit (RHU) in administrative custody pending his disciplinary hearing.  (*Id.*, ¶ 24.)  Consequently all of his personal property was packed and delivered to the RHU to be inventoried by RHU staff.  (*Id.*, ¶ 24.)

Mr. Nuñez was taken to the RHU's "strip cage" to be processed into the RHU. He advised Sgt. Sheetz (non-defendant) that he had a November 9, 2011 legal deadline and asked that he let the property officers on the 2 p.m. to 10 p.m. shift, CO Householder and Sgt. Britton), know that he will need access to his property. (*Id.*, ¶ 27.) Sgt. Sheetz assured Mr. Nuñez that he would advise the RHU property officers of his concerns. (*Id.*)

At approximately 6:30 p.m. on November 6, 2011, CO Householder and CO Goughnour began to inventory Plaintiff's property and "discovered he had legal documents that did not bare (sic) his name." (*Id.*, ¶ 29.) As a result Sgt. Britton requested a search team to bring Mr. Nuñez to the property room. Defendants Householder, Goughnour, Britton, Wertz and Hazlett were present in the property room at the same time as Mr. Nuñez. Defendants Britton and Wertz advised Plaintiff that he had "way to (sic) much property. On top of the fact that you have other people's legal work. Why? You some type of jail house lawyer?" (*Id.*, ¶ 32.) Mr. Nuñez advised that Superintendent Fisher had approved his request to have an additional storage box of legal materials for his active cases as evidenced by the large approval slip taped on the box lid. As for the legal documents with other people's names on it, they related to his co-defendants. (*Id.*, ¶ 33.) CO Wertz questioned the validity of Superintendent Fisher's approval and expressed frustration in trying to determine what property was legitimately Plaintiff's. CO Wertz determined he would issue Mr. Nuñez a confiscation slip for all of his property "and hold it until Lt. Eichenlaub investigates this shit and determine[s] what he wants to do." (*Id.*, ¶ 34.) Plaintiff objected telling everyone present he had a November 9, 2011 deadline. Defendants Britton and Householder advised CO Wertz

that Sgt. Sheetz did advise them of Plaintiff's deadline.  Mr. Nuñez told CO Wertz that a copy of his court order setting forth the deadline was in the folder bearing his criminal case number. While retrieving the court order to show CO Wertz, Plaintiff said "Come on Wertz you know if you confiscate my legal work I'm gonna miss my deadline.  Then I'm gonna have to file a grievance." (*Id*., ¶¶ 35 – 36.)  CO Wertz asked Plaintiff if he was threatening him.  Mr. Nuñez responded that "[i]ts not a threat. I can file a grievance if I want to." (*Id*., ¶ 37.)  CO Hazlett "began to instigate the exchange of words" between Plaintiff and CO Wertz by adding "[t]hat sure as hell sounds like a threat." (*Id*., ¶ 38.)  Upset by the encounter CO Wertz said he "was gonna allow you to have the documents you needed to work on your case ass-hole.  But your mouth fucked that up." (*Id*., ¶ 39.)  Mr. Nuñez turned to Sgt. Britton and asked if he was going to allow "them" to take all of his legal work.  Sgt. Britton responded that "[i]ts their call. Not [his]." (*Id*., ¶41.)  Plaintiff's request for a grievance was denied by CO Wertz who then began to utter racially derogatory slurs that were discriminatory and offensive. (*Id*., ¶ 41.)  "We don't have grievances in Spanish.  You people can't read or write English anyway." (*Id*., ¶ 42.) Plaintiff then asked Sgt. Britton "to speak to a white shirt".  Sgt. Britton laughed and instructed CO Householder and CO Goughnour to escort Mr. Nuñez back to his cell after he signed a property receipt. (*Id*., ¶ 43.)  While Plaintiff was leaving, CO Wertz and CO Hazlett began searching Plaintiff's typewriter.  Prior to leaving the RHU, Mr. Nuñez learned that CO Wertz broke his typewriter. (*Id*., ¶ 45 and ¶ 47.)

On November 14, 2011, Mr. Nuñez grieved (Grievance 389468-11) regarding the confiscation of his legal materials and that "he was unable to meet a deadline in his criminal

case causing his meritorious claims to be forever waived under state law". (*Id.*, ¶46; *see also* ECF No. 41, pp. 25 – 54.)  The grievance was denied at final review on April 2, 2012.  (*Id.*, p. 54.) On November 18, 2011, Plaintiff filed Grievance 390184-11 concerning the damage to his typewriter.  (ECF No. 40, ¶ 47; *see also* ECF No. 41, p. 56.)

### C.      December 20, 2011 – Conversation with CO Wertz

At approximately 6:40 p.m. on December 20, 2011, CO Wertz approached Mr. Nuñez. He told Plaintiff that CO Eichenlaub had interviewed him about the confiscation of his legal property.  He expressed that "Eichenlaub and Fisher [are] up [his] ass[.] [b]ecause legal at Central Office has to get involved." (ECF No. 40, ¶ 49.)  He stated that he cannot go to court and say he withheld Plaintiff's legal material knowing he had a deadline.  He said he only took Plaintiff's property because Sgt. Britton and CO Householder did not want to search it.  CO Wertz admitted that when he flipped Mr. Nuñez's typewriter over, the cover broke off.  He said he would replace the typewriter but "Eichenlaub wants [Plaintiff] to withdraw [his] grievance." (*Id.*, ¶ 51.)  Mr. Nuñez declined the offer noting that "[he] had to file a lawsuit to get [his] rights back."  (*Id.*, ¶ 52.)

### D.      April 16, 2012 – Cell Search by CO Wertz and CO Hazlett

On April 16, 2012, an investigative cell search was conducted of Mr. Nuñez's cell.  (*Id.*, ¶ 53.)  The cell search was conducted at the direction of Officers Smith and another officer because it was believed Mr. Nuñez had a map of the prison compound.  (ECF No. 41, p. 99,

Grievance 411463-12 and ECF No. 41-1.) The 6 a.m. - 2 p.m. search team commenced the search and removed two large trash bags of items from the cell Plaintiff shared with his cellmate. At some point, CO Wertz and CO Hazlett "of the 2 - 10 search team" took over the search. (*Id.*) CO Wertz and CO Hazlett removed one large trash bag filled with unspecified items from the cell. (*Id.*) Neither search team issued Mr. Nuñez a confiscation slip.

Plaintiff claims CO Wertz and the other members of the search team retaliated against Plaintiff by "stealing his property." He also claims CO Wertz told Plaintiff's cellmate that he was a snitch. (*Id.*, ¶ 54.) There is no mention of CO Wertz calling Mr. Nuñez a snitch in the grievance submitted by Plaintiff along with his Amended Complaint.


### E. Renovations of SCI-Smithfield's Dining Hall

From October 2011 through June 2012, SCI-Smithfield's inmate dining hall underwent major renovations. Defendant Fisher authorized his staff to continue normal feeding operations during, and for the duration of, the construction.

Work was performed using welders, saws and other machines while inmates ate their meals in the dining hall. During the renovations, construction workers divided the dining hall, from floor to ceiling, with a plastic tarp. The North side of the dining hall was where non-dietary meals were served. Medically approved meals were served on the South side. The South side contained a rough-framed side opening which allowed freezing cold wind to enter while the North side was protected from the wind by the tarp.

Mr. Nuñez ate three meals a day on the South side of the dining hall. He was exposed to pollutants like carbon monoxide, metallic fumes, and sawdust while he dined. (*Id.*, ¶¶ 55 – 62.) In the month of January temperatures in the dining hall fell below 45˚F. (*Id.*, ¶ 63.) While staff were permitted to wear winter hats and gloves Mr. Nuñez was repeatedly admonished for wearing a hat while eating. In Mr. Nuñez's January 27, 2012 grievance he requested permission to wear his hat and gloves to meals. (*Id.*, ¶ 64; *see also* ECF No. 41, pp. 69 – 73.) The individual responding to the grievance noted that the kitchen was experiencing "a heating issue" and noted the institution "had below normal winter temperatures" during the time in question and that once the problem was brought to the attention of Captain Southerland, the Maintenance department resolved the situation "a couple of days later." (ECF No. 41, p. 70.) The doorway to the dining hall was also changed. However, "rules regarding dining hall attire will not be altered during the construction period." (*Id.*) After personally visiting the dining hall during breakfast, Superintendent Fisher affirmed the denial of Plaintiff's request to wear a hat during meals. (*Id.*, p. 72.) Mr. Nuñez argues the conditions were not corrected but continued for two months. (ECF No. 40, p. 67.) In February 2012, conditions worsened as roaches and pigeons infested the dining hall. Pigeon feces and feathers regularly fell upon tables, food trays, serving stations, water pitchers, and Mr. Nuñez's clothing. (*Id.*, ¶ 74 – 76.) Plaintiff swatted vermin from the non-sanitized table tops and eating areas. (ECF No. 40, p. 69.) Mr. Nuñez grieved the bug infestation and the unsanitary dining conditions in Grievances 405508-12 and 400510-12. The institution's Safety Manager responded that staff was "aware of the birds and roaches in this area and are in the

process of trying to get rid of these pests from the area." (ECF No. 41, p. 80.) He also noted that the kitchen staff cleaned and sanitized the dining area before and after each meal line. (*Id.*; *see also* pp. 80 – 88.) Exterminators were hired to eradicate the pests. Mr. Nuñez claims that in addition to being unsuccessful in their efforts, the extermination process left the air in the dining hall saturated with "a foul odor of decaying roaches and bird feces." (ECF No. 40, ¶ 72.) As a consequence, Mr. Nuñez experienced coughing, migraines, skin, eye and nasal irritation. (*Id.*, ¶ 73.)

### III.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The question is "not whether [plaintiff] will ultimately prevail ... but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529 - 30, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011) (internal citations and quotations omitted). A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

In order to survive dismissal for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. While the court must accept as true all of the allegations in the complaint, legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 566 U.S. at 678, 129 S.Ct. at 1949; *see also Connelly*, 809 F.3d at 787. To be sufficient, a complaint needs to set forth a plausible "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964). Formulaic recitations of the elements of a cause of action will not suffice. The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. The court need not assume that the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's " 'bald assertions' " or " 'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir.

1997)).  Likewise, the Court has no duty to "conjure up unpleaded facts that might turn a frivolous ... action into a substantial one."  *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (citing *O'Brien v. DiGrazia*, 544 F.2d 543, n.3 (1st Cir. 1976)).

When considering a motion to dismiss, a district court generally must limit itself to the complaint, including any attachments thereto, and matters of public record.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  The court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss.  *Pension Benefit Guar. Corp.*, 998 F.2d at 1196.

Where a pro se plaintiff's complaint is vulnerable to dismissal for failure to state a claim, he must be granted leave to file a curative amended complaint even when the plaintiff does not seek leave to amend, unless such an amendment would be inequitable or futile.  *See Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 861 (3d Cir. 2014).  A complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend.  *Grayson v. Mayview State Hospital*, 293 F.3d 103, 106 (3d Cir. 2002).

## IV.    Discussion

### A.    Statute of Limitations for Civil Rights Actions

There is no specific statute of limitations for actions filed pursuant to 42 U.S.C. § 1983. *Pearson v. Sec'y Dept. of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015). Rather, the United States Supreme Court has held that the length of the statute of limitations for personal injury tort law of the state where the cause of action arose is to be employed. *Wallace v. Kato*, 549 U.S. 384, 387, 127 S.Ct. 1091, 1094, 166 L.Ed.2d 973 (2007); *see also Estate of Lagano,* 769 F.3d at 859 - 60. As Pennsylvania has a two year statute of limitations for personal injury actions, the statute of limitations applicable to claims brought under § 1983 in Pennsylvania is two years, subject to any state law tolling provisions which are not inconsistent with federal law. *See* 42 PA. CONS. STAT. § 5524(7) (2014); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009); *Lake v. Arnold*, 232 F.3d 360, 368 - 69 (3d Cir. 2000). A civil rights cause of action accrues, and the statute of limitations begins to run, "'when the plaintiff knew or should have known of the injury upon which [his] action is based.'" *Kach,* 589 F.3d at 634 (quoted cases omitted).

Pursuant to the prison mailbox rule, *see Houston v. Lack*, 487 U.S. 266, 275-76, 108 S.Ct. 2379, 2384-85, 101 L.Ed.2d 245 (1988), the Court will consider the Complaint as being filed on April 8, 2014, and not April 15, 2014, the date it was received by the Court. (ECF No. 1, Compl., p. 4.) Accordingly, any claim arising prior to April 8, 2012, is barred by the statute of limitations unless the statute was tolled for some reason. In the context of inmate litigation, the statute of limitations is tolled while an inmate plaintiff exhausts his administrative remedies. *See Pearson*, 775 F.3d at 603 ("[T]he PLRA is a statutory prohibition that tolls

-12-

Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies.") Defendants contend that claims not fully exhausted prior to April 16, 2012 are barred by the two year statute of limitations.[3]

As noted above, the Court will use April 8, 2012, and not April 16, 2012, for our statute of limitations discussion and will examine each claim Defendants argue is time barred. First, Defendants assert that Mr. Nuñez's First Amendment religion claim is time barred as he exhausted his administrative remedies as to this claim on June 1, 2010, more than two years prior to filing this case. (ECF No. 50, p. 15.) Mr. Nuñez counters that he never raised a First Amendment religion claim. (ECF No. 69, p. 14.) ("[T]he Plaintiff has not raised a religious claim under the freedom of religion clause of the First Amendment.") As such, Defendants' motion to dismiss Plaintiff's First Amendment religion claim will be granted. Next, Defendants assert that Plaintiff's access-to-courts claim stemming from the November 6, 2011 confiscation of his legal materials is time barred because his related grievance was denied at final review on April 2, 2012. (ECF No. 41, p. 54.) Mr. Nuñez argues that the limitations period should be tolled for a period because prison officials interfered with his ability to timely file his lawsuit by denying him access to "relevant documents." (ECF No. 69, pp. 14 - 15.) Defendants did not file a Reply brief addressing this issue. At this point, the Court cannot

---

[3] Defendants do not assert that Mr. Nuñez's RLUIPA claim is time barred. RLUIPA claims have a four-year statute of limitations. *See Robinson v. Superintendent Houtzdale SCI*, Civ. No. 16-3893, 2017 WL 2627917 (3d Cir., Jun. 19, 2017) (citing 28 U.S.C. § 1658 (2006) and *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S.Ct. 1836, 1845, 158 L.Ed.2d 645) (holding that the four-year catch-all federal statute of limitations, codified at 28 U .S.C. § 1658(a), governs claims brought under RLUIPA).

determine the extent of tolling of the limitations period to which Mr. Nuñez is entitled, if any, due to Defendants' alleged interference. Accordingly, Defendants' motion to dismiss Plaintiff's access-to-courts claim based on the statute of limitations will be denied. Finally, Defendants argue that Plaintiff's claim related to the damage to his typewriter by CO Wertz is time barred. Nuñez's grievance was resolved on December 12, 2011, when prison officials agreed to repair the damage at the institution's expense. (ECF No. 41, p. 56.) Thus, Plaintiff had until December 12, 2013 to file a complaint concerning the alleged retaliatory destruction of his typewriter. In his opposition brief Mr. Nuñez argues that the limitations period should be extended as he received permission to file a second grievance concerning his typewriter. (ECF No. 69, p. 17 and ECF No. 69-1, p. 28.) The Court does not agree. Mr. Nuñez's initial grievance addressed the damage to his typewriter by CO Wertz. It was exhausted in December 2011. Mr. Nuñez's subsequent requests to staff members, and potential grievance, addressed his dissatisfaction with the repair of his typewriter. The issues of the two grievances are separate and distinct. Mr. Nuñez fully exhausted the claim that CO Wertz damaged his typewriter in retaliation for the exercise of his First Amendment rights on December 12, 2011. The statute of limitations ran on this claim December 12, 2013; therefore, this claim will be dismissed.

### B. Mr. Nuñez's RLUIPA Claim

RLUIPA prohibits imposing a substantial burden on an inmate's religious exercise unless that burden furthers a compelling interest and is the least restrictive means of

furthering that interest. 42 U.S.C. § 2000cc-1(a). "[A] substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v Klem*, 497 F.3d 272, 280 (3d Cir. 2007). RLUIPA does not create a private right of action for damages against prison officials in their individual capacities, *Sharp v. Johnson*, 669 F.3d 144, 153 (2012), and claims for damages against them in their official capacities are barred by the sovereign immunity of the Commonwealth of Pennsylvania, *Sossamon v. Texas*, 563 U.S. 277, 293, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011).

To prevail on a claim under RLUIPA, an inmate's burden is two-fold: he must show that (1) the relevant religious exercise is "grounded in a sincerely held religious belief" and (2) the government's action or policy "substantially burden[s] that exercise" by, for example, forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.'" *Holt v. Hobbs,* ____ U.S. ___, ___, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015) (quoting *Burwell v. Hobby Lobby Stores*, Inc*.,* ____ U.S. ____, ____, 134 S.Ct. 2751, 2775, 189 L.Ed.2d 675 (2014)); *see also Washington,* 497 F.3d at 277 - 78. If the plaintiff makes this *prima facie* showing, the burden then shifts to the government "to show that the policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest." *Washington*, 497 F.3d at 283; *see also* 42 U.S.C. § 2000cc-1(a).

Mr. Nunez argues that, as a Muslim, the DOC policy that prohibits him from rolling up his pant legs to expose his ankles violates RLUIPA. Plaintiff admits that DOC's grooming

policies forbid the alteration of inmate uniforms but that he is permitted to roll up his pant legs during communal Jum'ah services. He also acknowledges that Defendant Klopotoski's denial of his RAR request was based on security concerns that "prison garb (when altered) can be used for gang identification". (ECF No. 41, ¶ 9.) Nonetheless, he argues that the restriction on having his pant legs cuffed at all times places a substantial burden on his free exercise of his Muslim religion. Defendants do not contest the validity of beliefs but argue that Mr. Nuñez fails to state a claim upon which relief could be granted.

At this early stage of the proceedings, the allegations in Plaintiff's Amended Complaint adequately state a valid RLUIPA claim concerning whether the DOC's policy of prohibiting Mr. Nuñez from wearing his hem above his ankles at all times, not just during religious services, unduly burdens Plaintiff's ability to freely exercise his religion insofar as it prevents him from altering the length of his trousers for religious purposes. To the extent Mr. Nuñez seeks monetary damages against Regional Deputy Klopotoski, this aspect of Plaintiff's RLUIPA claims must be dismissed. Mr. Nuñez's RLUIPA claim must be limited to a claim for injunctive relief against Defendant Klopotoski in his official capacity. In all other respects, the Defendants' motion to dismiss for failure to state a claim under RLUIPA will be denied.

### C.    Mr. Nuñez Fails to State an Access-to-Courts Claim

Inmates have a constitutional right to access the courts, *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), and may recover for denial of that right in a civil rights lawsuit if he or she can demonstrate that an actual injury occurred as a result of the denial, *Lewis v. Casey*, 518 U.S. 343, 352 - 53, 116 S.Ct. 2174, 2180 - 81, 135 L.Ed.2d

606 (1996). To meet this requirement, a plaintiff must show that the actions of prison officials hindered his efforts to pursue a non-frivolous claim. *See Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008); *Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 2187, 153 L.Ed.2d 413(2002). Plaintiff must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983. *Id.* at 416, 122 S.Ct. at 2187; *see also Monroe,* 536 F.3d at 205. Conclusory allegations are not sufficient in this regard. *Johnson v. Cash*, 557 F. App'x 102, 104 n. 3 (3d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949). In *Monroe*, the Third Circuit Court of Appeals upheld a district court's determination that complaint failed to state an access-to-courts claim upon which relief could be granted and stated the following:

> In this case, the defendants confiscated all of the plaintiffs' contraband and non-contraband legal materials, including their legal briefs, transcripts, notes of testimony, exhibits, copies of reference books, treatises, journals, and personal handwritten notes. In their initial pleadings, the plaintiffs' claim rested solely on the ground that the defendants confiscated their legal materials, contraband and non-contraband alike. That claim, on its face, was insufficient to state a claim under *Harbury*. So too were their subsequent amendments, which alleged that they lost the opportunity to pursue attacks of their convictions and civil rights claims but did not specify facts demonstrating that the claims were non-frivolous. Nor did they maintain that they had no other remedy to compensate them for their lost claims. Even liberally construing their complaints as we must do for pro se litigants, they do not sufficiently allege that they have suffered an actual injury.

536 F.3d at 206 (internal citation and footnote omitted). Clearly *Monroe* establishes that merely stating that a prisoner was deprived of legal materials is insufficient to show that the lost potential claims were non-frivolous. Finally, it is well-settled that the lack of a meritorious

underlying claim precludes a plaintiff from subsequently pursuing a constitutional denial of access-to-courts claim. *See, e.g., Prater v. City of Philadelphia*, 542 F. App'x 135, 137 (3d Cir. 2013); *Allen v. Ripoll*, 150 F. App'x 148, 150 (3d Cir. 2005).

Mr. Nuñez claims CO Wertz's and CO Eichenlaub's November 6, 2011 confiscation of his legal materials "prevented [him] from filing a timely objection to his PCRA counsel's [Turner/]*Finley* letter."[4]  (ECF No. 40, ¶¶ 91 - 99.)  He claims his PCRA counsel was ineffective for failing to address his trial counsel's failure to object to his defective waiver of counsel colloquy. (*Id.*, ¶ 101; *see also* ECF No. 69, p. 24.)  He states "[n]owhere in the state trial transcript did the trial court explain to Plaintiff the nature and elements of all the Criminal (sic) charges for which the Plaintiff stood trial.  Nor did the court communicate to Plaintiff the range of penalties the trial court could impose."  (ECF No. 40, ¶ 102.)

Defendants argue, citing information gleaned from Mr. Nuñez's criminal docket, that he fails to plead facts which establish an actual injury, the loss of a non-frivolous claim due to the Defendants' actions.  A brief review of Mr. Nuñez's criminal matter is necessary for the Court to determine whether or not Plaintiff has asserted an access-to-courts claim.

---

[4]  In *Commonwealth v. Turner*, 518 Pa. 491, 494- 95, 544 A.2d 927, 928 (1988), the Pennsylvania Supreme Court, applying *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), held that counsel seeking to withdraw from a case in which the right to counsel does not derive from the United States Constitution may provide a "no-merit letter" which details "the nature and extend of [the attorney's] review and list[s] each issue the petitioner wished to have raised, with counsel's explanation of why those issues were meritless."  The Court, not counsel, then proceeds, after examination of all the proceedings, to decide whether the case is wholly frivolous.  The Court will then decide to grant counsel's request to withdraw and to allow petitioner to proceed *pro se*.

Mr. Nuñez's first criminal trial, where he was represented by counsel, resulted in a mistrial. Following a *Grazier* hearing, Mr. Nuñez represented himself *pro se* at his retrial with the assistance of stand-by counsel. Ultimately, a jury convicted Mr. Nuñez "of first degree murder, criminal conspiracy and possessing an instrument of crime (PIC), for the contract killing of Christopher Jastrzebski on May 13 2001, when [Mr. Nuñez] was 17 years old." *Commonwealth v. Nuñez*, No. 199 EDA 2012 (Pa. Super. Jan. 14, 2014). After the jury returned a guilty verdict, Mr. Nuñez was sentenced to life imprisonment for the murder conviction and concurrent terms of 5 to 10 years' and 2½ to 5 years' imprisonment on the criminal conspiracy and PIC charge. *See* ECF No. 50-1, Criminal Docket Sheet in *Commonwealth v Nuñez*, CP-51-CR-0402401-2004 (Phila. Ct. Com. Pl.) His judgment of sentence was affirmed by the Superior Court of Pennsylvania on December 23, 2008. His Petition for Allowance of Appeal was denied by the Supreme Court of Pennsylvania on July 27, 2009. *See See Commonwealth v. Nuñez*, 965 A.2d 299 (Pa. Super. 2008) (unpublished memorandum), *appeal denied*, 602 Pa. 688, 81 A.2d 218 (Pa. 2009).

Mr. Nuñez filed his first PCRA petition on February 12, 2010. His court appointed counsel filed a *Finley* letter on September 30, 2011. On October 21, 2011, the PCRA Court issued notice of its intent to dismiss the petition and granted Mr. Nuñez the opportunity to file a response. On November 16, 2011, Mr. Nuñez filed an emergency motion requesting an extension of time to file objections to the Court's notice of intent to dismiss his petition. On December 2, 2011 the PCRA Court "following a review of the pleadings, the submissions of counsel, *appellant's response to the Notice of Intent to Dismiss*, the record and the controlling law" dismissed Mr. Nuñez's PCRA petition. (*Id.*) (emphasis added). Thus it appears that

Plaintiff was able to submit objections to his PCRA counsel's filing and the Court's notice of intent to dismiss his PCRA petition, and that his submission was considered by the PCRA Court when it reached its December 2, 2011 decision. He filed a timely notice of appeal to the Pennsylvania Superior Court which was denied. *See Commonwealth v. Nuñez,* No. 199 EDA 2012, 2014 WL 10988236 (Pa. Super. Jan. 14, 2014). The Superior Court addressed the six issues raised by Mr. Nuñez and found them to be meritless.[5] (*Id.*) Notably, none of the issues raised on appeal argued trial counsel's ineffectiveness concerning the *Grazier* hearing. (*Id.*)

Mr. Nuñez argues that he can demonstrate the requisite actual injury requirement because he never learned of the PCRA Court's grant of his request for an enlargement of time to respond to his counsel's *Finley* letter. Such a statement is not supported by the PCRA Court's December 2, 2011 Order in which it states it reviewed "appellant's response to the Notice of Intent to Dismiss". *See Commonwealth v. Nuñez,* No. 199 EDA 2012, 2014 WL 10988236 (Pa. Super. Jan. 14, 2014). He offers no evidence to demonstrate prison officials hindered his efforts to pursue a non-frivolous claim. Moreover, the PCRA Court, upon receipt of counsel's *Finley* letter conducted an independent review of Mr. Nuñez's PCRA petition and found it to be meritless. Mr. Nuñez has failed to describe the underlying claim with sufficient

---

[5] The Court notes that on May 26, 2016, Mr. Nuñez filed another PCRA petition based on the decision in *Montgomery v. Louisiana*, —— U . S . ——, 2016 WL 280758 (filed January 25, 2016), which held that *Miller v. Alabama*, ____ U.S. ____, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (mandatory life sentences without the possibility of parole are unconstitutional for juvenile offenders) applies retroactively to cases on collateral appeal. Plaintiff filed an amended PCRA petition on March 7, 2017. That petition is currently pending before the Philadelphia County Court of Common Pleas.

specificity to show that it is anything "more than mere hope". *Monroe v. Beard*, 536 F.3d 198, 205 - 06 (3d Cir. 2008).

Accordingly, Mr. Nuñez's access-to-courts claim against CO Wertz and CO Eichenlaub will be dismissed for failure to state a claim upon which relief may be granted. Mr. Nuñez will not be granted leave to amend this claim as it would be futile to do so given the PCRA Court's dispositive Order.

### D. Mr. Nuñez Fails to State a Failure to Intervene Claim

Under certain circumstances, a correctional officer's failure to intervene to prevent a constitutional violation by another may render him culpable under 42 U.S.C. § 1983. In order for liability to attach, a plaintiff must show that: (1) the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was "a realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002).

As plead by Mr. Nuñez, Sgt. Britton, CO Householder, CO Goughnour and CO Hazlett were present when CO Wertz decided not to release his legal materials to him on November 6, 2011, but decided to pass the matter on to Lt. Eichenlaub. He argues that these Defendants knew he had an impending court deadline and therefore had a duty to intervene on his behalf so he would not miss his deadline. (ECF No. 40, ¶¶ 30, 34 - 36, 44.) As noted above, "there must exist an underlying constitutional violation" for there to be a failure to intervene. *Knight v. Walton*, 2014 WL 1316115, at *8 (W.D. Pa. 2014) (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)). On November 6, 2011, no overt or clear

constitutional violation took place in front of these Defendants, thus obviating their need to intervene. Plaintiff does not plead a set of facts against them to show it was objectively unreasonable for them to believe, at the time, that the actions of CO Wertz violated his constitutional rights. Accordingly, Mr. Nuñez fails to nudge his failure to intervene claim from possible to plausible. Mr. Nuñez will not be granted leave to amend this claim as it would be futile to do so based on the Court's dismissal of his access-to-court's claim.

### E. Mr. Nuñez's Retaliation Claims

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." *See White v. Napoleon*, 897 F.2d 103, 111 - 12 (3d Cir. 1990). It is well-settled that "[g]overnment actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Allah v. Seiverling*, 229 F.3d 220, 224 - 25 (3d Cir. 2000)).

A prisoner claiming a First Amendment retaliation claim must show that: (1) he was engaged in constitutionally protected conduct; (2) he suffered "adverse action" at the hands of the defendant,[6] and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him. *Watson v. Rozum,* 834 F.3d 417, 422 (3d Cir. 2016). "To establish the requisite causal connection a plaintiff usually must prove either

---

[6] This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Allah*, 229 F.3d at 225 (quoting *Suppon v. Dadonna*, 203 F.3d 228, 235 (3d Cir.2000)).

(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. V. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.[7] *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005).

Following the satisfaction of a *prima facie* case of retaliation by plaintiff, the burden shifts to defendants to demonstrate, by a preponderance of the evidence "that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

**(1)    Retaliatory Confiscation of Legal Materials**

To the extent Mr. Nuñez argues that his voicing of his right to file a grievances was a constitutionally protected activity, and the statement was the motivating factor in CO Wentz's decision to withhold his property from him, he has not demonstrated that he suffered an "adverse action" as a result of the temporary hold of his legal property. Upon his admission to the RHU, Mr. Nuñez's property, including his legal materials, was confiscated. On November 6, 2011, CO Wertz decided to allow Lt. Eichenlaub to resolve the issue of how much and what legal property would be returned to Plaintiff. Mr. Nuñez was not permanently denied these materials. At issue is the temporary delay in his receipt of them. As noted

---

[7]    Only where the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, standing alone, support an inference of causation. *Krouse v. American Sterlizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

earlier, Mr. Nuñez's access-to-courts claim based on the November 2011 confiscation of his legal materials fails to state a claim based on his inability to satisfy the "actual injury" component of his claim.  Consequently, his retaliation claim based on the same series of events will be dismissed due to his failure to show he suffered an "adverse action" as a result of CO Wertz's actions.  Mr. Nuñez will not be granted leave to amend this claim as it would be futile to do so.

### (2)    April 16, 2012 - Cell Search by CO Wertz and CO Hazlett

It is well-established that "[t]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell," *Crosby v. Piazza*, 465 F. App'x 168, 172 (3d Cir. 2012)*,* as prisoners do not have a reasonable expectation of privacy, *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (personal property includes legal papers)).   However, it has also been held that while the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells, it does not mean that searches which constitute "calculated harassment unrelated to prison needs" are permissible. *Hudson*, 468 U.S. at 530, 104 S.Ct. at 3202; *Prisoners' Legal Ass'n v. Roberson*, 822 F. Supp. 185, 189 (D.N.J. 1993); *Proudfoot v. Williams*, 803 F. Supp. 1048, 1051 (E.D. Pa. 1992) (stating that searches conducted for 'calculated harassment' may constitute an Eighth Amendment violation).  "Nor does it mean that prison attendants can ride roughshod over inmates' property rights with impunity." Hudson 468 U.S. at 530, 468 S.Ct. at 3202.  A

cell search, and the resulting confiscation of property, may constitute an adverse action,[8] if motivated solely by a retaliatory motive. *See Stafford v. Wetzel*, Civ. No. 4:CV013-2026, 2015 WL 474273, at *6 (M.D. Pa. Feb. 5, 2015) (denying defendants' motion to dismiss that a cell search could not constitute adverse action).

Defendants seek dismissal of Mr. Nuñez's retaliation claim based on the April 16, 2012 cell search arguing that "a cell search does not constitute an adverse action." (ECF No. 50, p. 26.) In his opposition brief, Mr. Nuñez states he is not asserting that the cell search was initiated for retaliatory purposes. (ECF No. 69, p. 33.) Rather he claims CO Wertz's actions of confiscating his personal property and telling his cellmate that he was a "snitch" were retaliatory in nature. (*Id*.)

Accordingly, the Defendants' motion to dismiss the claim that the cell search was conducted for retaliatory reasons is granted. The Court will address Mr. Nuñez's "snitch" claim *infra*.

F.    **Mr. Nuñez's Eighth Amendment Claims**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical

---

[8] An adverse action is any action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah*, 229 F.3d at 225

care, and must take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994).

### (1) Plaintiff's Failure to Protect Claim Based on CO Wertz calling Him a Snitch

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Being violently assaulted in prison is simply not a part of the penalty that criminal offenders pay for their offenses against society. *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977.

To establish a failure-to-protect claim, an inmate must assert facts demonstrating that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). After a prisoner makes a prima facie showing of deliberate indifference, an official can rebut it "either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers–Capitol*, 256 F.3d 120, 133 (3d Cir. 2001).

"The question of [the defendant's] deliberate indifference is a subjective inquiry . . . while risk of harm is evaluated objectively." *Betts v. New Castle Youth Dev. Ctr*, 621 F.3d 249, 256 (3d Cir. 2010) (internal citations omitted). "[I]n determining whether a prison official has shown deliberate indifference to inmate health or safety, [a court] must look to what a prison official actually knew rather than to what a reasonable official in his or her position should have known." *Serafin v. City of Johnstown*, 53 F. App'x 211, 214 (3d Cir. 2002) (non-

precedential).  Not only must a prison official be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but the official "must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.  A prison "official who knows of a risk to a prisoner can avert liability if he shows he acted reasonably, even if injury still occurred."  *Freeman v. Miller*, 615 F. App'x 72, 76 (3d Cir. 2015) (non-precedential) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001)).

Plaintiff asserts that on April 16, 2012, CO Wertz notified his cellmate that he was a "snitch" and that "[h]e reports every damn thing.  If I were you I would move out this cell.  He's probably dropping request slips on you."  (ECF No. 40, ¶¶ 151 - 155.)  "As a direct and proximate result of Defendant Wertz comments," Mr. Nuñez was involved in several fist fights on his housing unit, unbeknownst to prison staff.  (*Id.*, ¶¶ 154 - 155.)

Defendants contend Mr. Nuñez has not adequately pleaded a failure to protect claim against CO Wertz because there is a distinction between being labeled a "snitch" who reports staff misconduct versus a "snitch" who provides information about, or complains of, a fellow inmate to prison authorities.  (ECF No. 50, pp. 28 - 29.)  Defendants do not offer any caselaw in support of their theory.  Nonetheless, it is alleged that CO Wertz also told Mr. Nuñez's cellmate that Plaintiff was likely filing grievances against him as well, suggesting that Plaintiff snitched on inmates and staff alike.  Accordingly, the Court will deny Defendants' motion to dismiss this claim.

**(2)  Mr. Nuñez's Conditions of Confinement Claim against Superintendent Fisher related to the Inhospitable and Unsanitary Conditions of the Dining Hall During its Renovations.**

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials. U.S. Const. amend. VIII; *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977. However, not all deficiencies and inadequacies in prison conditions amount to a violation of an inmate's constitutional rights. Likewise, the Eighth Amendment does not mandate that prisons be free from discomfort. *See Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) ("[R]outine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

"A claim of inhumane prison conditions may rise to the level of an Eighth Amendment violation where the prison official 'deprived the prisoner of the minimal civilized measure of life's necessities' and 'acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (quoting *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016)). Accordingly, to sufficiently allege a constitutional challenge to prison conditions, a prisoner must show that: (1) the deprivation alleged was objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977. "However, only 'extreme deprivations' are sufficient to present a claim for unconstitutional conditions of confinement."

*Dockery v. Beard*, 509 F. App'x 107, 112 (3d Cir 2013) (non-precedential) (*citing Hudson*, 503 U.S. at 8 - 9, 112 S.Ct. at 999 - 1000.)

In order to satisfy the first requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977. "Such a showing requires 'more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to" the alleged unconstitutional risk. *Betts*, 621 F.3d at 257 (quoting *Helling*, 509 U.S. at 36, 113 S.Ct. at 2482). Plaintiff must also establish that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," i.e., "the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36, 113 S.Ct. at 2482.

With regard to the second requirement, the Supreme Court has explained that "deliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer*, 511 U.S. at 835, 114 S.Ct. at 1978. The Supreme Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." *Id.* at 836-37, 114 S.Ct. at 1978 - 79. In reviewing this type of claim, the courts have stressed the importance of the duration of the complainant's exposure to the alleged unconstitutional conditions, and a review of the "totality of the circumstances," and not just the allegedly egregious conditions themselves as critical.

*Rhodes,* 452 U.S. at 362-33, 101 S.Ct. at 2407; *see also Tillery v. Owens*, 907 F.2d 418, 426 - 27 (3d Cir. 1990).

In the instant case, Plaintiff alleges that Defendant Fisher subjected him to cruel and unusual punishment by exposing him, three times a day, to the cold and unsanitary conditions in SCI-Smithfield's dining hall while it was under construction between October 2011 to June 2012. (ECF No. 40, ¶¶ 55 - 72.) Mr. Nuñez alleges Superintendent Fisher instructed that inmate feeding would continue in the dining hall during the construction phase. Inadequate heat, exposure to noxious fumes and bird and insect infestation occurred during the construction period. Superintendent Fisher was aware of the intolerable cold and unsanitary conditions of the dining hall via grievances. Taking Mr. Nuñez's allegations as true, and considering the totality of the circumstances of Mr. Nuñez's limited exposure to these conditions each day, he fails to state an Eighth Amendment claim against Superintendent Fisher.

Mr. Nuñez provides a considerable number of documents in support of his Amended Complaint. Grievances that reached Superintendent Fisher concerning the conditions in the dining hall demonstrate that he reviewed and investigated the issues and his subordinates' responses to the complaints concerning the dining hall's heat and sanitation. As to the frigid temperature in the dining hall, Superintendent Fisher noted heating problems in the kitchen and that "[t]he doorway to the dining hall [was] been changed." These remedies took place "within a few days." (ECF No. 41, p. 70 and p. 73.) Additionally, Superintendent Fisher "personally [was present] in the kitchen during breakfast feedings" and found that "wearing

of a coat [was] more than adequate during the time [Mr. Nuñez] consume[d] [his] meal. As previously stated, the kitchen is undergoing expansion and challenges with the temperature, entrance, egress, and seating can continue to be expected until completion." (*Id.*, p. 72.) Also, when presented with complaints concerning the sanitation of the dining hall, staff verified that "kitchen staff [were] cleaning and sanitizing the dining areas before and after each meal line [was run]." (*Id.*, p. 80; *see also* p. 86.) Superintendent Fisher added that "[s]teps were being taken in regard to the water pitchers" and that "we continue to actively pursue ridding the birds of this area as well." (*Id.,* p. 81.) Superintendent Fisher's responses to grievances concerning the continued use of the dining hall during its renovation fail to demonstrate his deliberate indifference to Mr. Nuñez's health or safety as he noted the inconvenience to all as well as addressed heating and sanitation issues. Moreover, considering the totality of the circumstances, Mr. Nuñez admits that he was exposed to these conditions three times a day during construction. Mr. Nuñez does not argue he was required to remain in the dining hall longer than the meal period. The remainder of each day he was located elsewhere in the institution. Thus, his exposure to the conditions during the renovations in the dining hall were limited in duration and when problems arose, he presented them to staff and Superintendent Fisher who addressed them.

Accordingly, based on the allegations of the Amended Complaint, Mr. Nuñez fails to state a conditions of confinement claim against Superintendent Fisher. *See Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) ("[R]outine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting

*Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2392). Mr. Nuñez will not be granted leave to amend this claim as it would be futile to do so based on the exhibits attached to the Amended Complaint and Plaintiff's lack of injury.

### G. Mr. Nuñez's Conspiracy Claim

In order to demonstrate the existence of a conspiracy under § 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law." *Laurensau v. Romarowics*, 528 F. App'x 136, 140 (3d Cir. 2013) (non-precedential) (internal citations omitted). To plead a conspiracy claim properly, a plaintiff must allege "facts that plausibly suggest a meeting of the minds." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 170 (3d Cir. 2010). "Bare conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flanagan v. Shively*, 783 F.Supp. 922, 928 (M.D. Pa. 1992). A plaintiff cannot rely on subjective suspicions and unsupported speculation. *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991). The complaint must not plead merely a "conclusory allegation of agreement at some unidentified point." *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966. A conspiracy claim that lacks "an adequate factual basis" is properly dismissed. *Simmons v. Szelewski*, 642 F. App'x 95, 99 (3d Cir. 2016) (non-precedential) (citing *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988)).

In his opposition brief, Mr. Nuñez states that "[i]n the absence of discovery," he cannot defend against the Defendants' motion to dismiss his conspiracy claim and thus agrees to the dismissal of this claim "without prejudice." (ECF No. 69, p. 42.) At this juncture, Mr. Nuñez is not required to prove the conspiracy claim he plead in his Amended Complaint, however, he must adequately plead such a claim. Defendants are entitled to dismissal of this claim as Mr. Nuñez does not sufficiently allege a conspiracy claim. *See Albrecht v. Hamilton*, 233 F. App'x 122, 125 (3d Cir. 2007) (plaintiff unsuccessful in asserting conspiracy claim where he fails to give defendants fair notice of what his claim is and on the grounds upon which it rests).

### H.    Plaintiff's State-Created Danger Claim

In order to establish a claim for state-created danger, the plaintiff bears the burden of proving four elements:

> (1) the harm ultimately caused the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

*Phlips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

Defendants assert that "Plaintiff asserts *no facts* to support [his] state created danger claim". (ECF No. 50, p. 33.) Plaintiff disagrees. (ECF NO. 69, p. 42.) In Count VII of the Amended Complaint, in a single paragraph, Mr. Nuñez pleads a state-created danger claim, based on the identical set of facts of his Eighth Amendment conditions-of-confinement claim,

against Superintendent Fisher.  *See* ECF No. 40, ¶ 135.  Pursuant to 28 U.S.C. § 1915(e)(2)(B) the Court can dismiss, "at any time" any portion of a claim that is frivolous or fails to state a claim.  On this basis the Court will dismiss Mr. Nuñez's state-created danger claim.

The Third Circuit Court of Appeals has addressed the application of the state-created danger doctrine in the prison context.  *See Beenick v. LeFebvre*, 684 F. App'x 200 (3d Cir. Apr. 11, 2017) (citing *Betts*, 621 F.3d 259 - 60).  Such claims are barred by the more-specific-provision rule.  (*Id.*)  Similar to *Beenick and Betts*, Mr. Nuñez's claims

> "concern[ed] his conditions of confinement and alleged failure by Defendants to ensure his safety." *Id*. at 261.  "Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we held that the more-specific-provision rule foreclose[d] [plaintiff's] substantive due process claims." *Id*.  This holding precludes [Plaintiff] from bringing a state-created danger claim based on the conditions of his confinement and the alleged failure of Defendants to ensure his safety using the slicer.

*Beenick*, 684 F. App'x at 205 (quoting *Betts*, 621 F.3d at 261); *see also B.L. v. Lamas*, Civ. No. 3:15-cv-1327 (M.D. Pa. Feb. 14, 2017) (J. Mariani).  Accordingly, the Court will dismiss Mr. Nuñez's state-created danger claim without leave to amend as Plaintiff's access-to-courts claim is dismissed.

### I. Mr. Nuñez's State Law Tort Claims are barred by Sovereign Immunity

Defendants seek to dismiss Mr. Nuñez's state law tort claims on the basis of sovereign immunity. (ECF No. 50, pp. 34 - 35.) State officials are immune from suit for those actions within the scope of their duties, except in instances in which the immunity has been specifically waived. *See* 1 PA. CONS. STAT. ANN. § 2310. None of the remaining claims of Mr. Nuñez's Amended Complaint fall under any one of the nine listed categories for which immunity has been waived by the Commonwealth of Pennsylvania.[9] *See* 42 PA. CONS. STAT. ANN. § 8522(B). As such, the Defendants are entitled to immunity on the state law tort claims and their motion will be granted in this regard.

An appropriate Order follows.

/s/ A. Richard Caputo
**A. RICHARD CAPUTO**
**United States District Judge**

**DATE: September 1, 2017**

---

[9] The nine categories for which sovereign immunity will not apply are: (1) vehicle liability; (2) medical professional liability; (3) care custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. *See* 42 PA. CONS. STAT. ANN. § 8522(b).